Belknap,
June 24, 1942. } No. 3330

VIOLET R. ARCHIBALD, *Adm'x of the Estate of Everett C. Archibald*
v. BOSTON & MAINE RAILROAD.

EDNA O. SWAIN, *Adm'x of the Estate of Stephen C. Swain, Sr.*
v. SAME.

EDNA O. SWAIN, *Adm'x of the Estate of Stephen C. Swain, Jr.*
v. SAME.

*Johnson & Keller (Mr. Johnson* orally), for Violet R. Archibald, Adm'x.

*Robert W. Upton* and *Laurence I. Duncan (Mr. Duncan* orally), for Edna O. Swain, adm'x of the estates of Stephen C. Swain, Sr. and Stephen C. Swain, Jr.

*Theo S. Jewett* and *Thomas P. Cheney (Mr. Jewett* orally), for the defendant.

MARBLE, J.  The defendant's track at the scene of the accident runs in the general direction of east and west and parallels the Daniel Webster Highway, which is situated about three hundred and fifty feet north of Knapp's Crossing.  The roadway over this crossing extends from the Daniel Webster Highway southward to an

office building, a storehouse and sheds, a sawmill, a coal yard, and oil tanks located on the southerly side of the track.

For some years previous to 1938 the sawmill had not been in operation, but after the hurricane of that year new machinery was installed and the mill fully equipped for the purpose of salvaging the so-called hurricane timber. At the time of the accident, trucks carrying logs to the mill passed over Knapp's Crossing upwards of a hundred times a day, and traffic over the crossing was heaviest at about five o'clock in the afternoon. The proprietor of the coal yard and oil tanks operated several trucks which made frequent daily trips over the crossing, and there was other substantial traffic to and from the mill and yard.

The decedent Archibald was in the employ of Stephen C. Swain, Sr., and the two men had been hauling logs to the mill since the first of March, making on an average four round trips a day. Just before the accident they were taking away from the mill on Swain's truck a large pine log which had been rejected by the scaler. Swain was driving the truck. Archibald sat on the right side of the cab, and Swain's nine-year-old son was seated between them.

The speed of the truck as it approached the crossing did not exceed ten miles an hour. The mill scaler, who was following the truck, testified that a "normal person" would have been able to stop the truck "in at least fifteen feet." Another witness, who saw the accident, expressed the opinion that, under the conditions that existed, the truck could have been stopped "in no time" or "in a foot at about that speed."

The roadway at the time of the accident approached the crossing from the south on a slight incline. At a point in the center of the roadway forty-five feet south of the crossing, a person could see up the track easterly a distance of 1,100 feet. A photograph taken from the center of the roadway fifty-three feet, nine inches from the nearest rail shows an unobstructed view of the track eastward for six hundred and sixty feet. The truck proceeded to the crossing with no substantial change in speed and was struck "in the center of the door of the cab" by the Montreal-to-Boston express "drifting" down grade at a speed of from fifty to sixty miles an hour.

A whistling post was situated three hundred and forty feet east of Knapp's Crossing, but the signal required to be given at that point was for the benefit of travelers at the Hosiery Crossing, eighty rods or more to the westward. See P. L., c. 249, s. 23. No signal was required for Knapp's Crossing, and warning signs erected on

each side of the crossing read as follows: "Private Crossing. Dangerous. Engines do not Whistle for this Crossing."

Ordinarily, a traveler approaching a particular crossing would not be entitled to rely upon a signal required to be given for a different crossing (*Brody* v. *Gilbert*, 82 N. H. 158; *Wells* v. *O'Keefe*, 91 N. H. 299, 303, 304), and the testimony in the present case does not disclose any circumstance which would render the general rule inapplicable.

There is no evidence to support the contention that since the defendant "customarily gave a signal by whistle just before reaching" Knapp's Crossing, Swain may "well have been misled" into believing that the warning was intended for that crossing despite the posted signs to the contrary. This argument presupposes Swain's knowledge of the situation, and if he had such knowledge and had observed the approach of the train on other occasions, he must have noticed that the signal was given only a few seconds before the crossing was reached. But even assuming that Swain was justified in relying upon the signal as customarily given, there is no substantial evidence that it was not given at the usual place and in the usual manner.

At a point about fifty feet south of Knapp's Crossing the road curves to the east and runs "partially parallel" with the track. The easterly end of the storehouse is opposite a point three hundred and sixty feet from the crossing or about opposite the whistling post. The easterly end of the wood shed is opposite a point about two hundred and sixty feet from the crossing.

Four witnesses testified variously that they heard the whistle of the locomotive "at the end of the office," "up behind the sheds," "in back of the sheds," and "back of the office within two hundred feet of the crossing." None of these witnesses were paying particular heed to the place at which the signal was first given, and there is nothing in their testimony which disproves the assertion of the defendant's engineer that he blew the whistle at or very near the whistling post.

It is true that the mill scaler, who was following Swain in his "Ford pickup," testified that he heard no whistle until he "saw the train almost hitting the truck," but he did not state definitely that he was listening for a whistle, he merely "assumed" that he was doing so because of the "great respect" he held "for trains and railroad crossings." He admitted that Swain's truck, which was running in low gear, made "some noise."

A civil engineer, called by the plaintiffs, testified that "from forty-five feet south of the crossing proceeding along the road in a southerly direction," the storehouse cuts off the view of the track, and the view "keeps getting less and less as you travel towards the office." But this fact must have been well known to Swain, and due care on his part demanded attention to the situation at a point where a view of the track would be effective. *Niemi* v. *Railroad,* 87 N. H. 1, 3. Mrs. Swain testified that her husband when driving over a railroad crossing always "listened and looked both ways." But, on the present occasion, he could not have looked carefully to his right after his view of the track became unobstructed and not have seen the train. Listening would be of questionable avail, considering the noise made by the truck, which was carrying a log eight feet long and three feet in diameter.

The fact that it may have been difficult for Swain, who was seated at the left of the cab, to look out of the right-hand window in the direction from which the train was coming did not entitle him to close his eyes to the dangers of the crossing, with which he was familiar. He must have known that the express was due at about that time. He had been hauling logs to the mill for a month or more. The mill ran until midnight, and the truck drivers made their final trips to the mill each day at about five o'clock. The accident occurred at 5:05. The train was scheduled to arrive in Tilton at five o'clock and was only a few minutes late.

It is our conclusion that the only reasonable inference to be drawn from the evidence is that Swain drove upon the crossing in ignorance of the advancing train and that his ignorance in that respect "must be found to be due to his failure to exercise any care for his own protection." *Collins* v. *Hustis,* 79 N. H. 446, 448.

The doctrine of the last clear chance is inapplicable, for there is no evidence from which it could fairly be found that the defendant's fireman, who saw the truck when it was about sixty feet from the crossing, was aware that the driver was ignorant of his peril. See *Small* v. *Railroad,* 85 N. H. 330, 334; *Clark* v. *Railroad,* 87 N. H. 36; *Frost* v. *Stevens,* 88 N. H. 164, 165; *Gaudette* v. *McLaughlin,* 88 N. H. 368, 373. The fireman testified that "from the speed of the truck" he "had every reason to believe" that the operator was going to stop; that he kept his eye on the truck, and when it was about ten or twelve feet from the crossing he saw it "wasn't going to stop," and that he then shouted, "Whoa!" to the engineer, who immediately "threw the brakes into emergency and turned on the sand."

It follows that the defendant's motion for a directed verdict in the action brought to recover for the death of Stephen C. Swain, Sr. should have been granted.

It does not appear that either Archibald or Stephen C. Swain, Jr. was guilty of any contributory fault (see *Hoen* v. *Haines*, 85 N. H. 36, 39; *Cyr* v. *Railroad*, 88 N. H. 278, 281), and since there is evidence of negligence on the part of the railroad, the motions for directed verdicts in the actions brought to recover for their deaths were properly denied. *Collins* v. *Hustis*, 79 N. H. 446, 449. On the issue of the defendant's negligence there was evidence that the defendant knew of the substantial increase in traffic over Knapp's Crossing occasioned by the reopening of the sawmill and evidence that the speed of the train at the time of the accident was greater than that allowed by the defendant's rules. Under such circumstances, even though the crossing was a private one, it was for the jury to say whether ordinary care did not require a more effective warning of the train's approach. *Dowse* v. *Railroad*, 91 N. H. 419, and cases cited. See, also, *Collins* v. *Hustis*, *supra*; *Carbone* v. *Railroad*, 89 N. H. 12, 15, 16.

The defendant excepted to the admission of evidence of the use, maintenance, and repair of the roadway and to the introduction of a so-called track chart on the ground that the evidence was inadmissible to prove the existence of a public crossing. It is unnecessary to decide the question, however, for even if defendant's counsel are correct in their contention, no prejudice can have resulted from the admission of this evidence, since the Presiding Justice correctly ruled that the evidence was insufficient to support a finding that Knapp's Crossing was a public highway crossing. The jurors were so instructed and were informed that the defendant was under no statutory obligation to give the decedents a warning signal.

Since no argument has been advanced in support of the remaining exceptions, they are deemed to be waived.

> *Judgment for the defendant in the second action:*
> *judgments on the verdicts in the other actions.*

All concurred.